UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHANE VELTKAMP,

Plaintiff,

Case No.
Hon.

v.

VITALCORE HEALTH STRATEGIES, LLC
COUNTY OF NEWAYGO, ADVANCED
CORRECTIONAL HEALTHCARE, INC.,
TAMMY PROVATAS, M.D., LAURIE FRY, NP,
MELISSA SCHULTZ, R.N., ELEXIS SAWYER, R.N.,
CHAD WOLINSKI, N.P., CARLYNN VANHALL, R.N.,
DOUGLAS SHELTON, R.N., JOHN DOE 1,
JOHN DOE 2, ANDREA EDGAR, N.P., ALLISON
MELINOWSKI, R.N., MELISSA BARDEN, R.N.,
DREW WRIGHT, R.N.,

Defendants.

---

MATTHEW L. TURNER (P48706)
LISA M. ESSER (P70628)
SOMMERS SCHWARTZ, P.C.
One Towne Square, Ste. 1700
Southfield, MI 48076
(248) 355-0300
Attorneys for Plaintiff
Lesser@sommerspc.com
Mturner@sommerspc.com

---

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, SHANE VELTKAMP, by and through his attorneys, SOMMERS SCHWARTZ, P.C., and for his Complaint and Demand for Jury against the above-named Defendants, states as follows:

## PARTIES, JURISDICTION AND VENUE

1. This action arises under the United States Constitution, particularly under the provisions of the Eighth and Fourteenth Amendments to the United States Constitution and under the laws of the United States, particularly under the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

2. Plaintiff SHANE VELTKAMP (DOB: 2/27/1995) is a resident of Newaygo County, Michigan.

3. From July 17, 2023 to November 2, 2023, Plaintiff was a detainee housed at Newaygo County Jail, in the City of White Cloud, County of Newaygo, State of Michigan.

4. From November 3, 2023 to December 27, 2023, Plaintiff was a prisoner housed at Charles Egeler Reception & Guidance Center (RGC) in the City of Jackson, County of Jackson, State of Michigan.

5. From December 28, 2023 to February 12, 2024, Plaintiff was a prisoner housed at Central Michigan Correctional Facility (STF) in the City of St. Louis, County of Gratiot, State of Michigan.

6. From February 13, 2024 to March 4, 2024, Plaintiff was a prisoner housed at Cooper Street Correctional Facility (JCS) in the City of Jackson, County of Jackson, State of Michigan.

7. From March 5, 2024 to July 25, 2024, Plaintiff was a prisoner housed at Carson City Correctional Facility (DRF) in Carson City, County of Montcalm, State of Michigan.

8. From July 26, 2024 to October 15, 2024, Plaintiff was a prisoner housed at Duane Waters Health Center (DWH) in the City of Jackson, County of Jackson, State of Michigan.

9. At all times relevant hereto, Defendant COUNTY OF NEWAYGO (hereinafter "NEWAYGO COUNTY") was a municipal corporation organized under the laws of the State of Michigan and is sued in its official capacity. It is responsible for the operation of the Newaygo County Jail and for establishing, implementing, and enforcing policies, practices, and procedures regarding the care, custody, and safety of individuals housed there, including detainees with medical conditions.

10. Defendant NEWAYGO COUNTY is liable in its own capacity for its own actions and inactions of deliberate indifference.

11. At all relevant times, Defendant ADVANCED CORRECTIONAL HEALTHCARE, INC., (hereinafter "ACH") was and is a for-profit foreign corporation licensed to do business in Michigan, with its principal place of business in Illinois. At all times pertinent hereto, ACH was and is obligated by contract to provide managed healthcare and/or medical care to Newaygo County Jail inmates generally, and to Plaintiff, SHANE VELTKAMP, in particular.

12. Upon information and belief, Defendant ACH's Resident Agent is The Corporation Company, 40600 Ann Arbor Road E., Ste. 201, Plymouth, MI 48170. Defendant ACH conducts business throughout the State of Michigan and in both the eastern and western districts of Michigan.

13. Upon information and belief, Defendant ACH is the entity responsible for the control and oversight of the operation and staffing of medical personnel at the Newaygo

County Jail, including the organization, hiring, training, operation, supervision, retention, and discipline of medical staff personnel at Newaygo County Jail and the medical training of Newaygo County Jail employees.

14. Defendant ACH is liable in its own capacity for its own actions and inactions of deliberate indifference.

15. At all relevant times, upon information and belief, Defendant TAMMY PROVATAS, M.D., (hereinafter "PROVATAS") was a registered medical doctor licensed to practice medicine in the State of Michigan, conducted regular business in the County of Newaygo, State of Michigan, is a resident of the western district of Michigan and was an employee of Defendant ACH or under contract with Defendant ACH to provide medical care to the inmates of Newaygo County Jail and acting under color of law and within the scope of her employment or agency, and is sued in her individual capacity.

16. Defendant PROVATAS participated in Plaintiff's medical care and oversight of his medical care and was deliberately indifferent to his known serious medical needs.

17. At all relevant times hereto, Defendant PROVATAS was the actual, apparent, and/or ostensible principal, agent, servant and/or employee of Defendant ACH and at all relevant times was acting within the course and scope of her agency and/or employment with Defendant ACH when the deliberate indifference alleged herein was committed.

18. Defendant VITALCORE HEALTH STRATEGIES, LLC (hereinafter "VITALCORE") is a for-profit foreign corporation licensed to do business in Michigan, with its principal place of business in Kansas. At all times pertinent hereto, VITALCORE was and is obligated by contract to provide managed healthcare and/or medical care to

Michigan Department of Corrections inmates generally, and to Plaintiff, SHANE VELTKAMP, in particular.

19. Upon information and belief, Defendant VITALCORE's Resident Agent is CSC-Lawyers Incorporating Service, 3410 Belle Chase Way, Ste. 600, Lansing, MI 48911. Defendant VITALCORE conducts business throughout the State of Michigan and in both the eastern and western districts of Michigan.

20. Upon information and belief, Defendant VITALCORE is the entity responsible for the control and oversight of the operation and staffing of medical personnel at MDOC facilities beginning on May 1, 2024 until present, including the organization, hiring, training, operation, supervision, retention, and discipline of medical staff personnel at MDOC facilities and the medical training of MDOC employees.

21. VITALCORE participated in or was responsible for Plaintiff's monitoring and care while he was in custody and acted with deliberate indifference to his known serious medical needs.

22. At all relevant times, upon information and belief, Defendant ANDREA EDGAR, N.P. (hereinafter "EDGAR") was a registered nurse practitioner licensed to practice as a nurse practitioner in the State of Michigan, was a resident and conducted business regularly in the Montcalm County, Michigan, and was an employee of Defendant VITALCORE or under contract with Defendant VITALCORE to provide medical care to the inmates of the MDOC and acting under color of law and within the scope of her employment or agency, and is sued in her individual capacity.

23. Defendant EDGAR participated in Plaintiff's medical care and oversight of his medical care and was deliberately indifferent to his known serious medical needs.

24. At all relevant times hereto, Defendant EDGAR was the actual, apparent, and/or ostensible principal, agent, servant and/or employee of Defendant VITALCORE and at all relevant times was acting within the course and scope of her agency and/or employment with Defendant VITALCORE when the deliberate indifference alleged herein was committed.

25. At all relevant times, upon information and belief, Defendant ALLISON MELINOWSKI, R.N. (hereinafter "MELINOWSKI") was a registered nurse licensed to practice as a nurse in the State of Michigan, was a resident and conducted business regularly in Montcalm County, State of Michigan and was an employee of Defendant VITALCORE or under contract with Defendant VITALCORE to provide medical care to the inmates of the MDOC and acting under color of law and within the scope of her employment or agency, and is sued in her individual capacity.

26. Defendant MELINOWSKI participated in Plaintiff's medical care and oversight of his medical care and was deliberately indifferent to his known serious medical needs.

27. At all relevant times hereto, Defendant MELINOWSKI was the actual, apparent, and/or ostensible principal, agent, servant and/or employee of Defendant VITALCORE and at all relevant times was acting within the course and scope of her agency and/or employment with Defendant VITALCORE when the deliberate indifference alleged herein was committed.

28. At all relevant times, upon information and belief, Defendant MELISSA BARDEN, R.N. (hereinafter "BARDEN") was a registered nurse licensed to practice as a nurse in the State of Michigan, was a resident and conducted business in Montcalm

County, State of Michigan and was an employee of Defendant VITALCORE or under contract with Defendant VITALCORE to provide medical care to the inmates of the MDOC and acting under color of law and within the scope of her employment or agency, and is sued in her individual capacity.

29. Defendant BARDEN participated in Plaintiff's medical care and oversight of his medical care and was deliberately indifferent to his known serious medical needs.

30. At all relevant times hereto, Defendant BARDEN was the actual, apparent, and/or ostensible principal, agent, servant and/or employee of Defendant VITALCORE and at all relevant times was acting within the course and scope of her agency and/or employment with Defendant VITALCORE when the deliberate indifference alleged herein was committed.

31. At all relevant times, upon information and belief, Defendant DREW WRIGHT, R.N. (hereinafter "WRIGHT") was a registered nurse licensed to practice as a nurse in the State of Michigan, was a resident and conducted business regularly in Montcalm County, State of Michigan and was an employee of Defendant VITALCORE or under contract with Defendant VITALCORE to provide medical care to the inmates of the MDOC and acting under color of law and within the scope of his employment or agency, and is sued in his individual capacity.

32. Defendant WRIGHT participated in Plaintiff's medical care and oversight of his medical care and was deliberately indifferent to his known serious medical needs.

33. At all relevant times hereto, Defendant WRIGHT was the actual, apparent, and/or ostensible principal, agent, servant and/or employee of Defendant VITALCORE and at all relevant times was acting within the course and scope of his agency and/or

employment with Defendant VITALCORE when the deliberate indifference alleged herein was committed.

34. Defendant VITALCORE is liable in its own capacity for its own actions and inactions of deliberate indifference.

35. At all relevant times, Defendant LAURIE FRY, N.P. (hereinafter "FRY") was a registered nurse practitioner licensed to practice as a nurse practitioner in the State of Michigan, was a resident of Monroe County, State of Michigan and provided medical care to the inmates of MDOC Charles Egeler Reception and Guidance Center in Jackson County, Michigan and was acting under color of law and is sued in her individual capacity.

36. Defendant FRY participated in Plaintiff's medical care and oversight of his medical care at Charles Egeler Reception and Guidance Center and was deliberately indifferent to his known serious medical needs.

37. At all relevant times, Defendant MELISSA SCHULTZ, R.N. (hereinafter "SCHULTZ") was a registered nurse licensed to practice as a nurse in the State of Michigan, was a resident of Jackson County, State of Michigan and provided medical care to the inmates of MDOC Charles Egeler Reception and Guidance Center in Jackson County, Michigan and was acting under color of law and is sued in her individual capacity.

38. Defendant SCHULTZ participated in Plaintiff's medical care and oversight of his medical care at Charles Egeler Reception and Guidance Center and was deliberately indifferent to his known serious medical needs.

39. At all relevant times, Defendant ELEXIS SAWYER, R.N. (hereinafter "SAWYER") was a registered nurse licensed to practice as a nurse in the State of Michigan, was a resident of Jackson County, State of Michigan and provided medical care

to the inmates of MDOC Charles Egeler Reception and Guidance Center in Jackson County, Michigan and was acting under color of law and is sued in her individual capacity.

40. Defendant SAWYER participated in Plaintiff's medical care and oversight of his medical care at Charles Egeler Reception and Guidance Center and was deliberately indifferent to his known serious medical needs.

41. At all relevant times, upon information and belief, Defendant CHAD WOLINSKI, N.P. (hereinafter "WOLINSKI") was a registered nurse practitioner licensed to practice as a nurse practitioner in the State of Michigan, was a resident of Saginaw County, State of Michigan and provided medical care to the inmates of MDOC Central Michigan Correctional Facility in Gratiot County, Michigan and was acting under color of law and is sued in his individual capacity.

42. Defendant WOLINSKI participated in Plaintiff's medical care and oversight of his medical care at Central Michigan Correctional Facility and was deliberately indifferent to his known serious medical needs.

43. At all relevant times, upon information and belief, Defendant CARLYNN VANHALL, R.N. (hereinafter "VANHALL") was a registered nurse in the State of Michigan, was a resident of Gratiot County, State of Michigan and provided medical care to the inmates of MDOC Central Michigan Correctional Facility in Gratiot County, Michigan and was acting under color of law and is sued in her individual capacity.

44. Defendant VANHALL participated in Plaintiff's medical care and oversight of his medical care at Central Michigan Correctional Facility and was deliberately indifferent to his known serious medical needs.

45. At all relevant times, upon information and belief, Defendant DOUGLAS SHELTON, R.N. (hereinafter “SHELTON”) was a registered nurse licensed to practice as a nurse practitioner in the State of Michigan, was a resident of Gratiot County, State of Michigan and provided medical care to the inmates of MDOC Central Michigan Correctional Facility in Gratiot County, Michigan and was acting under color of law and is sued in his individual capacity.

46. Defendant SHELTON participated in Plaintiff’s medical care and oversight of his medical care at Central Michigan Correctional Facility and was deliberately indifferent to his known serious medical needs.

47. At all relevant times, upon information and belief, Defendant unknown medical provider JOHN DOE 1 provided medical care to the inmates of MDOC Cooper Street Correctional Facility in Jackson County, Michigan and was acting under color of law and is sued in his individual capacity.

48. Defendant JOHN DOE 1 participated in Plaintiff’s medical care and oversight of his medical care at Cooper Street Correctional Facility and was deliberately indifferent to his known serious medical needs.

49. At all relevant times, upon information and belief, Defendant unknown medical provider JOHN DOE 2 provided medical care to the inmates of MDOC Cooper Street Correctional Facility in Jackson County, Michigan and was acting under color of law and is sued in his individual capacity.

50. Defendant JOHN DOE 2 participated in Plaintiff’s medical care and oversight of his medical care at Cooper Street Correctional Facility and was deliberately indifferent to his known serious medical needs.

51. The individual Defendants are not entitled to governmental immunity and/or qualified immunity.

52. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

53. A substantial part of the unlawful actions and omissions alleged in this Complaint took place within the County of Jackson, State of Michigan, and as such jurisdiction lies in the United States District Court for the Eastern District of Michigan, Southern Division. Venue is proper under 28 U.S.C. §1391(b).

54. The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, excluding interest, costs and attorney fees.

## FACTUAL ALLEGATIONS

55. Plaintiff hereby reincorporates and restates each and every allegation contained in the preceding paragraphs of this Complaint as if set forth herein.

### A. PLAINTIFF'S MULTIPLE SCLEROSIS DIAGNOSIS AND HIS SEVERE AND PROGRESSIVE DETERIORATION WITHOUT TREATMENT FOR OVER 10 MONTHS

#### NEWAYGO COUNTY JAIL

56. On July 17, 2023, Plaintiff SHANE VELTKAMP became a detainee at Newaygo County Jail. At that time, Plaintiff was fully mobile and independent of his activities of daily living.

57. On July 26, 2023, Plaintiff started to experience left sided numbness. He was transported to Spectrum Health for care and diagnosed with active demyelinating lesions concerning for Multiple Sclerosis (hereinafter "MS").

58. Multiple sclerosis is a serious, progressive neurological disease requiring prompt treatment to minimize irreversible neurological damage. Once neurological lesions are formed, they cannot be reversed so timely treatment is critical to avoiding progression of the disease and resulting disability.

59. On August 3, 2023, Plaintiff was sent back to the Emergency Room for evaluation of left sided tingling, chest pain, and left-handed weakness.

60. On August 8, 2023, Defendant PROVATAS reviewed the Emergency Room discharge paperwork from both the July and August hospital admissions and instructions that Plaintiff be seen by Neurology for follow-up and treatment of MS.

61. On August 9, 2023, a letter was sent from Greer Law Office to the Newaygo County Jail. Attorney Greer reported that Plaintiff was suffering from severe headaches, and medical staff were only giving him Tylenol which was not helping. Upon information and belief, this communication was ignored.

62. On August 10, 2023, Plaintiff reported having a "headache for weeks" and that the pain was 10/10. PROVATAS noted he had a recent diagnosis of MS. No new treatment was offered.

63. On August 17, 2023, Plaintiff reported difficulty swallowing food and drinks.

64. On September 11, 2023, Plaintiff was seen by Neurologist Nicholas Lannen, M.D. at the Spectrum Neurology MS Clinic. Dr. Lannen diagnosed Plaintiff with MS and ordered that Plaintiff be started on Ocrevus. Dr. Lannen was advised Plaintiff would be transferred to Jackson State Prison in just a couple weeks so he agreed that Ocrevus could be started after the transfer. Dr. Lannen noted that Plaintiff was currently

ambulating with no assistive devices and his speech was normal. A follow-up visit with Dr. Lannen was scheduled for November 13, 2023.

65. On September 12, 2023, PROVATAS reviewed Dr. Lannen's "After Visit Summary" indicating recheck with neurology for 11/15/2023, MS diagnosis and Ocrevus start date in October 2023.

66. On September 21, 2023, Dr. Lannen's office called Newaygo County Jail to check on status of Plaintiff and about Ocrevus start date. PROVATAS advised them that Plaintiff was still incarcerated in jail and that she did not have an estimated date of when he would be relocating and to what location. Nothing was done by PROVATAS to initiate treatment despite not knowing when Plaintiff would be transferred and understanding that treatment needed to be started for his serious medical condition.

67. On September 29, 2023, Dr. Lannen's office called Newaygo County Jail again inquiring about Plaintiff's location and treatment initiation. No update was provided on when or where Plaintiff would be transferred. Nothing was done by PROVATAS to initiate or arrange treatment.

68. On October 6, 2023, Dr. Lannen's officed contacted the Newaygo County Jail again to initiate Ocrevus treatment. No update was provided on when or where Plaintiff would be transferred. Nothing was done by PROVATAS to initiate or arrange treatment.

69. On October 13, 2023, Dr. Lannen's office called the Newaygo County Jail again to initiate Ocrevus treatment. No update was provided on when or where Plaintiff would be transferred. Nothing was done by PROVATAS to initiate or arrange treatment.

70. On October 14, 2023 and October 24, 2023, Plaintiff reported that he had been struggling with “peeing” for months. The complaints were reviewed by PROVATAS. Despite worsening MS symptoms, nothing was done by PROVATAS to initiate and/or arrange the Ocrevus treatment.

71. On October 27, 2023, Dr. Lannen’s office called the Newaygo County Jail again to initiate Ocrevus treatment. No update was provided on when or where Plaintiff would be transferred. Nothing was done by PROVATAS to initiate or arrange treatment. Plaintiff’s health continued to deteriorate and his MS progressed.

72. Defendants ACH and NEWAYGO COUNTY had a policy, practice, and/or custom of denying costly medical treatment for detainees that they knew would eventually be transferred to a MDOC prison or released.

73. During Plaintiff’s entire jail stay, PROVATAS observed that Plaintiff’s health was progressively deteriorating, and she was aware that he needed urgent treatment for his MS, a serious medical condition that without treatment would result in severe and permanent disabilities, and in deliberate indifference to his serious medical needs did nothing to arrange and initiate his MS treatment while he remained in Newaygo County Jail.

74. During the approximately five weeks preceding Plaintiff's transfer, personnel from Plaintiff's treating neurologist's office repeatedly contacted PROVATAS and NEWAYGO COUNTY personnel for the express purpose of arranging initiation of Ocrevus therapy. PROVATAS ignored or failed to act upon each of those communications. These repeated failures demonstrate that the deprivation suffered by Plaintiff was not an isolated mistake but the predictable result of NEWAYGO COUNTY’S and ACH's policies, customs,

training failures, supervisory failures, and institutional practices governing implementation of outside physician treatment plans.

75. At all relevant times during the incarceration of Plaintiff at Newaygo County Jail, Plaintiff repeatedly expressed and behaved in such a way that it was clear that he was experiencing a rapid decline in his health, including progressive worsening of his vision, mobility, bowel and bladder function, and other symptoms as a result of his untreated MS, and needed urgent treatment.

76. At all relevant times hereto, Defendant PROVATAS knew or should have known of Plaintiff's deteriorating condition and need for urgent treatment to prevent severe and permanent disabilities.

77. At all times relevant hereto, Defendant PROVATAS took no steps to initiate proper and timely treatment of Plaintiff's MS and ignored his continuing complaints and deteriorating condition, resulting in permanent and severe disabilities.

### *CHARLES EGELER RECEPTION & GUIDANCE CENTER (RGC)*

78. On November 3, 2023, Plaintiff was transferred to Charles Egeler Reception & Guidance Center.

79. On November 8, 2023, LAURIE FRY, N.P., received Dr. Lannen's records, including the September 11, 2023, visit detailing the diagnosis of MS and Ocrevus treatment that should have already started. Defendant FRY took no action to contact Dr. Lannen or initiate Ocrevus treatment. Plaintiff was now having balance issues and was provided with a cane. He continued to experience bladder incontinence.

80. On November 10, 2023, Dr. Lannen's office called the Charles Egeler Reception and Guidance Center. They left a message on the main line requesting a call back to coordinate treatment. Upon information and belief, FRY was made aware of this call. Dr. Lannen's call was never returned.

81. On November 13, 2023, FRY noted that she would "hold off on starting treatment of Ocrevus….until transfer to prison."

82. On November 30, 2023, Dr. Lannen's office called the Charles Egeler Reception and Guidance Center's healthcare line again requesting a call back so that Ocrevus therapy could be started. They left their direct line telephone number and fax number. Upon information and belief, FRY was made aware of this call. She did not return Dr. Lannen's call.

83. On December 2, 2023, Plaintiff filed a kite asking for help, as he was now suffering from constipation. His MS was progressing. Upon information and belief, FRY was made aware of this kite. She did not respond and provided no care or treatment.

84. On December 4, 2023, Plaintiff filed another kite asking for help due to **"worsening MS"**. This kite was received by MELISSA SCHULTZ, R.N. Upon information and belief, SCHULTZ took no action to get Plaintiff care or treatment.

85. On December 4, 2023, Plaintiff was seen by Joel Knight, R.N. Plaintiff reported that his MS was getting worse. He wanted to know when his treatment would start. Plaintiff was advised by nurse Knight that he had "no idea when or if there is a plan to put him on a new medication" but assured him that his medical provider, FRY, would be notified of worsening signs and symptoms.

86. On December 5, 2023, Defendant FRY reviewed Nurse Knight's note. FRY noted Plaintiff **"admittedly has not taken any treatment for his MS since diagnosis**. Plan was to obtain outside records and then neurology consult. No meds for MS will be started prior to neurology recommendation." Notably, FRY had already reviewed the records from Dr. Lannen's office a month earlier that documented the testing that was done, the diagnosis of MS, and the treatment that was required. Despite this, she continued to take no action and let Plaintiff's disease progress and his condition continue to deteriorate.

87. On December 7, 2023, ELEXIS SAWYER, R.N., noted **"worsening MS symptoms"** and an "unsteady gate". Upon information and belief, no treatment was provided and nothing was done to escalate his care.

88. On December 10, 2023, Plaintiff filed another kite asking for **help**. He was getting worse. This kite was reviewed by SCHULTZ. SCHULTZ noted that Plaintiff's MS was worsening and that he had several falls. Plaintiff questioned when he would start receiving his treatment but was informed by SCHULTZ that the medical provider was awaiting offsite records so a neurology consult could be made before prescribing any medication. Upon information and belief, SCHULTZ provided no treatment and did nothing to escalate his care and treatment or to otherwise get him help for his deteriorating condition.

89. On December 15, 2023, Defendant FRY placed a "routine" new consult request for neurology. This was done despite her review of Dr. Lannen's neurology records, extensive testing confirming MS and recommendation that Ocrevus treatment be started months earlier.

90. Defendant FRY scheduled the routine neurology consult visit with the Michigan State University (hereinafter "MSU") Department of Neurology for September 16, 2024 – 9 months later. Defendant FRY refused to initiate Ocrevus treatment until Plaintiff saw neurology at MSU.

91. Nothing was done by FRY, SCHULTZ, or SAWYER to initiate and/or arrange for Ocrevus treatment while Plaintiff was at Charles Egeler Reception & Guidance Center. Plaintiff's MS continued to progress and his health continued to deteriorate.

92. At all relevant times during the incarceration of Plaintiff at Charles Egeler Reception & Guidance Center, Plaintiff repeatedly expressed and behaved in such a way that it was clear that he was experiencing a rapid decline in his health, including progressive worsening of his vision, mobility, bowel and bladder function, and other symptoms as a result of his untreated MS, and needed urgent treatment as recommended by Dr. Lannen.

93. At all relevant times hereto, Defendants FRY, SCHULTZ, and SAWYER knew or should have known of Plaintiff's deteriorating condition and need for urgent treatment to prevent severe and permanent disabilities.

94. At all times relevant hereto, Defendants FRY, SCHULTZ, and SAWYER did not take steps to initiate proper and timely treatment of Plaintiff's MS and ignored his continuing complaints and deteriorating condition, resulting in permanent and severe disabilities.

### *CENTRAL MICHIGAN CORRECTIONAL FACILITY (STF)*

95. On December 28, 2023, Plaintiff was transferred to Central Michigan Correctional Facility in St. Louis Michigan.

96. On December 31, 2023, Plaintiff filed a kite noting **"I'm dying in here without proper help…please help me."** CARLYNN VANHALL, R.N., responded to the kite advising "your appointment with neurologist is waiting to be scheduled…be patient." VANHALL provided no treatment for his MS and did nothing to get him help or otherwise escalate his care. Plaintiff's MS continued to progress, and his health continued to deteriorate.

97. On January 4, 2024, Plaintiff filed a kite noting **"I need to be seen for my MS…it is getting worse and trouble walking."** DOUGLAS SHELTON, R.N., reviewed the kite and noted that he was on no medications and that he would place the medical provider RNR for MS symptoms worsening. SHELTON provided no treatment for his MS and did nothing to get him help or otherwise escalate his care. Plaintiff continued to deteriorate.

98. On January 9, 2024, Plaintiff was seen by CHAD WOLINSKI, N.P. It was noted that Plaintiff had increased difficulty ambulating. Plaintiff reported that he was supposed to be on Ocrevus but it had not been started. WOLINSKI stated that Plaintiff would need to be seen by neurology before MS treatment could be provided.

99. On January 25, 2024, Plaintiff reported that he was concerned that his MS was getting worse and he needed to see neurology. Plaintiff was assured a neurology appointment had been scheduled and to be patient. Nothing more was done to get him treatment or escalate his care.

100. Nothing was done by the medical providers at Central Michigan Correctional Facility to initiate and/or arrange for Ocrevus treatment while Plaintiff was at Central Michigan Correctional Facility.

101. At all relevant times during the incarceration of Plaintiff at Central Michigan Correctional Facility, Plaintiff repeatedly expressed and behaved in such a way that it was clear that he was experiencing a rapid decline in his health and worsening symptoms as a result of his untreated MS, and needed urgent treatment.

102. At all relevant times hereto, Defendant WOLINSKI, VANHALL and SHELTON knew or should have known of Plaintiff's deteriorating condition and need for urgent treatment to prevent severe and permanent disabilities.

103. At all times relevant hereto, Defendants WOLINSKI, VANHALL and SHELTON took no steps to initiate proper and timely treatment of Plaintiff's MS and ignored his continuing complaints and deteriorating condition, resulting in permanent and severe disabilities.

### *COOPER STREET CORRECTIONAL FACILITY (JCS)*

104. On February 13, 2024, Plaintiff was transferred to Cooper Street Correctional Facility in Jackson, Michigan.

105. On February 15, 2024, Plaintiff filed a kite noting that his **MS was worsening, that he was dying and he needed to see a neurologist soon**. A response from JOHN DOE 1 medical provider states "Your neurology appointment is pending scheduling. I have placed you on the schedule for an assessment." Upon information and belief, no MS treatment was provided and nothing was done to escalate his care and treatment.

106. On February 26, 2024, Plaintiff filed a kite noting that he was in **desperate need of help**, his MS was worsening and he needed to see the neurologist. A response from JOHN DOE 2 medical provider states: "inmate informed that it has been approved

but that there is no date scheduled for it yet." Upon information and belief, no MS treatment was provided and nothing was done to escalate his care and treatment.

107. Nothing was done by the medical providers at Cooper Street Correctional Facility to initiate and/or arrange for Ocrevus treatment while Plaintiff was at Cooper Street Correctional Facility. Plaintiff's MS continued to progress and his health continued to deteriorate.

108. On March 4, 2024, Dr. Lannen's office officially closed their file on Plaintiff and ended their efforts to arrange his Ocrevus treatment writing, in part: "I have not had luck in reaching healthcare coordinator at facility. At this point, I am closing encounter and we will have to wait until patient is released to resume therapy."

109. At all relevant times during the incarceration of Plaintiff at Cooper Street Correctional Facility, Plaintiff repeatedly expressed and behaved in such a way that it was clear that he was experiencing a rapid decline in his health and worsening symptoms as a result of his untreated MS, and needed urgent treatment as recommended by Dr. Lannen.

110. At all relevant times hereto, Defendants JOHN DOE 1 AND JOHN DOE 2 knew or should have known of Plaintiff's deteriorating condition and need for urgent treatment to prevent severe and permanent disabilities.

111. At all times relevant hereto, Defendants JOHN DOE 1 and JOHN DOE 2 took no steps to initiate proper and timely treatment of Plaintiff's MS and ignored his continuing complaints and deteriorating condition, resulting in permanent and severe disabilities.

### *CARSON CITY CORRECTIONAL FACILITY (DRF)*

112. On March 5, 2024, Plaintiff was transferred to Carson City Correctional Facility in Carson City, Michigan.

113. On March 12, 2024, Plaintiff was allegedly scheduled for a Michigan State University Neurology appointment for July 10, 2024.

114. On March 14, 2024, Plaintiff filed a kite noting that he **could not urinate**. No one responded to the kite for two weeks.

115. On March 29, 2024, Plaintiff was seen by Defendant ANDREA EDGAR, N.P. Plaintiff reported that he had trouble urinating and that it was getting worse. He reported incontinence of his bowel as well. He was informed that a neurology appointment had been scheduled for July, but no other treatment was offered, nothing was done to initiate the previous recommended Ocrevus treatment, and no urgent request for consult was made. It had now been 5 months since treatment should have started.

116. On April 17, 2024, Plaintiff filed a kite noting he was **getting worse and that he needed to see a neurologist**. Upon information and belief, EDGAR received the kite and did not respond.

117. On April 18, 2024, Plaintiff filed another kite asking when his MS treatment would start and reported that he was **getting bad**. Upon information and belief, EDGAR received the kite and did not respond.

118. On April 22, 2024, EDGAR performed a 30-day chart review and noted that she was “awaiting neuro”, despite Dr. Lannen’s MS diagnosis and the plan to start Ocrevus treatment 6 months earlier.

119. On May 1, 2024, VITALCORE began providing integrated prisoner healthcare and pharmacy services to all MDOC facilities.

120. On May 1, 2024, Plaintiff was seen by Defendant DREW WRIGHT, R.N. WRIGHT noted that Plaintiff's gait was getting bad, he was visibly shaking uncontrollably, and his speech was off. Plaintiff needed a food tray assist due to the shaking so that he could eat. Upon information and belief, WRIGHT did nothing to begin treatment for Plaintiff's MS or escalate his care.

121. On May 25, 2024, Plaintiff filed another kite. He again reported that his **MS was worsening and that he should have been seen by neurology months ago**. In response, EDGAR advised him that an offsite visit had been scheduled for July. Nothing more was done to provide treatment or escalate his care. Plaintiff's MS continued to progress and his condition deteriorated further.

122. On May 30, 2024, Plaintiff was seen by Defendant ALLISON MELINOWSKI, R.N. MELINOWSKI noted that Plaintiff's mobility was worsening and he needed a rolling walker instead of a cane. Plaintiff had started to have full body tremors. Defendant EDGAR prescribed a rollator. No MS treatment was initiated by EDGAR or MELINOWSKI and nothing was done to get him urgently into neurology, or to otherwise escalate his care.

123. On May 31, 2024, Plaintiff filed a kite reporting he **could not urinate**. Upon information and belief, EDGAR received this kite and did not respond.

124. On June 14, 2024, Plaintiff was seen by MELISSA BARDEN, RN, who noted increased tremors, trouble urinating and the need for a shower chair. Upon information

and belief, BARDEN arranged no treatment for his MS and did nothing to escalate his care.

125. On June 16, and June 21, 2024, Plaintiff filed kites reporting worsening vision and a need for glasses. Plaintiff had filed multiple kites over the course of 7 months asking for glasses for his worsening vision due to MS. None had been provided.

126. On June 27, 2024, EDGAR performed a clinical exam on Plaintiff. Plaintiff's MS was getting worse and ambulation was decreasing. He was prescribed a wheelchair. No treatment was started for his MS, and his care was not escalated.

127. On July 1, 2024, EDGAR saw Plaintiff again for his worsening MS. EDGAR advised Plaintiff to discuss his needs with the neurologist at his upcoming appointment. Treatment was not initiated and nothing further was done to escalate his care and treatment.

128. On July 2, 2024, Plaintiff suffered a fall in the shower due to ongoing and worsening mobility and began to suffer from persistent dizziness. Upon information and belief, EDGAR was advised of the fall and dizziness. Nothing was done to initiate MS treatment or escalate his care.

129. On July 3, 3024, Plaintiff's July 10th appointment with a neurologist was rescheduled to September 16, 2024 – notably, the original date scheduled by FRY in December 2023. Upon information and belief, EDGAR was advised of the rescheduling. EDGAR did nothing to explain the urgency of the need for the appointment, the dire condition of Plaintiff's health, his MS diagnosis, or the fact that MS treatment was supposed to have been started 9 months earlier.

130. On July 7, July 10, July 13, July 14, and July 15, 2024, Plaintiff filed multiple kites reporting his worsening condition including dizziness, incontinence, and frequent falls. Upon information and belief, EDGAR was provided with these kites. On July 15, 2024, a wheelchair was provided. No additional treatment was provided.

131. At all relevant times during the incarceration of Plaintiff at Carson City Correctional Facility and up to July 19, 2024, Plaintiff repeatedly expressed and behaved in such a way that it was clear that he was experiencing a rapid decline in his health and worsening symptoms as a result of his untreated MS, and needed urgent treatment.

132. At all relevant times hereto, Defendants EDGAR, WRIGHT, MELINOWSKI, BARDEN, VITALCORE and other VITALCORE employees/agents knew or should have known of Plaintiff's deteriorating condition and need for urgent treatment to prevent severe and permanent disabilities.

133. At all times relevant hereto, Defendants EDGAR, WRIGHT, MELINOWSKI, BARDEN, VITALCORE and other VITALCORE employees/agents did not take steps to initiate proper and timely treatment of Plaintiff's MS and ignored his continuing complaints and deteriorating condition, resulting in permanent and severe disabilities.

134. On July 19, 2024, Angelena Valdez, N.P., made arrangement for Plaintiff to be sent to the McLaren Greater Lansing Emergency Department for worsening MS symptoms. At this point, Plaintiff was unable to stand, eat or drink himself, had difficulty swallowing and was found to be incontinent of both bowel and bladder. An MRI of the brain revealed that in the interval space since prior exam on July 27, 2023, Plaintiff had developed numerous new lesions, with a very significant increase in overall extent of disease.

135. Plaintiff was started on IV steroids with a plan to begin Copaxone to treat his MS.

136. On July 26, 2024, Plaintiff was discharged to Duane Waters Health Center in Jackson, Michigan. This same day Danielle Alford, PA, started Plaintiff on Copaxone. Ms. Alford noted that "patient came to MDOC ambulating and he is currently in a WC and requiring assistances for transfers."

137. Plaintiff's MS had progressed to the point where he was confined to a wheelchair, suffered from constant dizziness, altered vision, slurred speech, bowel and bladder incontinence, full body tremors and spasms that were so violent that they caused headaches and made it impossible for him to brush his teeth, feed or bath himself.

138. Plaintiff was released from prison on October 15, 2024. He immediately started Ocrevus upon release. Unfortunately, because of the severe progression of his MS and multiple new lesions, Plaintiff still suffers from significant disabilities. He uses a wheelchair for mobility, his speech remains slurred, he continues to have tremors and requires assistance for all of his basic and instrumental activities of daily living , functional transfers and mobility needs.

### B. ***Advanced Correctional Healthcare's Corporate Cost Saving Policies, Customs, Practices, and Deliberate Indifference were the Moving Force Behind The Failure of Plaintiff to Receive Treatment for his MS while Housed at Newaygo County Jail***

139. ACH is a national provider of jail medical care.

140. ACH is the nation's largest privately owned provider of health care services to county jails in the country.

141. Its business model is to increase the volume of its sales by underbidding the competition and implementing severe cost control measures, the necessary result is unnecessary suffering by people detained in jail.

142. The ACH CEO, for example, has explained to potential customers that ACH keeps costs to the customers down by reducing visits to hospitals. This, the CEO explained, kept its customers happy and helped ACH increase its profits by allowing it to expand its business.

143. ACH indemnifies its jail customers, like NEWAYGO COUNTY, through substantial insurance coverage, and as a result ACH's customers, including NEWAYGO COUNTY, are willing to hire companies like ACH with poor track records in providing medical care, and they have little financial incentive to address deficiencies in the care provided at the jail.

144. In addition to these financial arrangements, ACH implements its cost control measures by training its employees to provide less care to detainees and by pressuring those employees to provide less care and treatment.

145. Upon information and belief, when ACH hires a new healthcare practitioner, the practitioner must attend a training session regarding the appropriate manner in which to provide medical care to people who are detained in jail. All new hires across the country are flown to ACH headquarters for this multiple-day training.

146. Upon information and belief, at the outset of the training, ACH trains its medical staff to believe that people who are detained in a jail are different than people in the free world because, whereas people in the free world seek healthcare because they have legitimate medical needs that require attention, people in jail seek healthcare in

order to be comfortable, because they are merely anxious, and for similar trivial and illegitimate reasons.

147. Upon information and belief, ACH trains its practitioners to ignore or discount medical concerns identified by persons in jails as things a person “wants” rather than legitimate medical needs, and it emphasizes that jail is “not a health spa,” such that jail staff can ignore many medical concerns raised by the detainees housed there.

148. Upon information and belief, trainings of this sort are repeatedly provided alike to ACH employees and correctional staff at facilities served by ACH.

149. Upon information and belief, in addition to training, ACH and its customers apply pressure on ACH employees to cut back on the quality of care provided to jail detainees if such care is likely to increase outside care or staffing costs.

150. Upon information and belief, ACH mis-trains its employees, pressuring them not to provide medical care they believe is clinically necessary, and delaying the provision of care and medications in hopes a detainee is transferred out of the jail and to a prison. These are all tactics that ACH uses to control its clients’ costs and increase its own profits, as set forth above.

151. ACH is indifferent to the danger that its practices will result in substandard or even catastrophic medical care.

152. Turning a blind eye to the inadequate and catastrophic instances of care that often result from its policies and practices allows ACH to continue providing inadequate care to the detriment of people who find themselves in detention, like Plaintiff.

153. ACH is a repeat offender and has been sued for similar civil rights violations over 650 times within the last five years.

154. Further, despite the repeated acts of deliberate indifference by the individuals Defendants and other employees of Defendant ACH similarly situated, Defendant ACH did nothing to retrain, remedy or otherwise address the pervasive unconstitutional conduct of its employees and agents, thereby condoning the unconstitutional conduct.

155. Upon information and belief, ACH maintained policies, practices, staffing decisions, utilization review procedures, approval requirements, referral practices, and other operational procedures that delayed or discouraged expensive outside specialty care and high-cost medications, including Ocrevus. Here, Dr. Lannen made the diagnosis of MS, he prescribed important treatment to stop the progression of Plaintiff's MS, he repeatedly called Newaygo County jail to get the treatment started, his diagnosis and treatment were acknowledged by ACH and PROVATAS and never executed, but rather put off until Plaintiff was no longer their problem. This case represents a systemic continuity of care failure.

156. As a result of ACH's official policy and custom of delaying costly medical treatment, Plaintiff did not receive the Ocrevus treatment he needed after his MS diagnosis, resulting in his disease progressively worsening, new lesions forming, and permanent and severe physical disabilities.

157. Defendant NEWAYGO COUNTY was or should have been aware of ACH's customs and practices that were deliberately indifferent to detainees/inmates' serious medical conditions.

158. Defendant NEWAYGO COUNTY knew of and disregarded the pattern of ACH providing constitutionally inadequate care to detainees/inmates, including Plaintiff,

at Newaygo County Jail and thus is also individually liable under the United States Constitution.

### *C. VitalCore Health Strategies' Corporate Cost Saving Policies, Customs, Practices, and Deliberate Indifference were the Moving Force Behind The Failure of Plaintiff to Receive Treatment for his MS while Housed in the MDOC and Carson City Correctional Facility*

159. VITALCORE was founded in 2015 and is a major, rapidly expanding mid-to-large tier player in the private correctional healthcare market. VITALCORE's annual revenue is between $200 million and $300 million. VITALCORE operates in 17 states and in over 100 correctional facilities nationwide, including MDOC facilities.

160. Defendant VITALCORE enters into lucrative contracts with correctional facilities wherein VITALCORE maximizes its profit margins by minimizing operational expenses.

161. Upon information and belief, to implement this business model, VITALCORE enforces unwritten but widespread customs and policies aimed at drastically reducing expenditures on offsite medical consultations, delaying diagnostic testing and treatment, and requiring its own approved physician's diagnosis inmates conditions before care is provided even though their conditions have been previously diagnosed and treatment plan already put in place.

162. Upon information and belief, VITALCORE is paid hundreds of millions of dollars a year in prepaid monthly installments, so if they can limit the services, care and treatment to prisoners, they get to keep the money saved.

163. VITALCORE touts that it controls costs by limiting off-site services by ensuring it has staff on site that are prepared and capable of assessing and treating

patients even in emergency situations, thus saving costs in outside care and treatment, and only providing treatment when absolutely necessary.

164. Whistleblowers have come forward about VITALCORE's custom and practice of frequently understaffing facilities and allowing nurses to conduct medical examinations that only physicians, physicians assistants, or nurse practitioners were authorized to perform.

165. These financial incentives and cost-cutting protocols effectively create an administrative barrier designed to delay or outright block necessary medical evaluations, shifts the burden of care to lower-cost and under-qualified staff, and intentionally defers treatment for serious medical conditions in deliberate indifference to the Eighth and Fourteenth Amendment rights of inmates.

166. Upon information and belief, Defendant VITALCORE maintained a persistent, continuous, and widespread practice of chronically understaffing the medical unit at Carson City Correctional Facility, both in terms of total personnel and the availability of licensed physicians and specialists. This persistent understaffing was not the result of temporary or accidental logistical constraints, but was rather a systemic corporate policy designed to reduce labor costs.

167. This lack of adequate medical personnel directly resulted in Plaintiff not being able to see medical doctors within a constitutionally acceptable timeframe, and resulted in predictable, unconstitutional delays in the treatment of his MS.

168. Upon information and belief, Defendant VITALCORE has an unwritten policy of saving costs by routinely delaying or denying outside referrals and necessary treatments. VITALCORE trained and encouraged its personnel to handle serious or

escalating clinical symptoms via inadequate, low-level conservative protocols for extended periods without escalating the patient to a qualified medical doctor.

169. Defendant VITALCORE knew, or should have known, that its policies and procedures would cause under-qualified staff to delay essential treatment and repeatedly deny or ignore critical requests for physician-level intervention.

170. Upon information and belief, Defendant VITALCORE had actual or constructive notice of these systemic deficiencies through an overwhelming pattern of patient grievances, internal staff complaints, and medical records detailing continuous delays in care and treatment. Despite clear knowledge that inmates were experiencing severe pain and progressive injury due to delayed physician and treatment access, VITALCORE took no corrective actions, failed to modify its staffing patterns, and continued to enforce its restrictive policies. VITALCORE's failure to intervene or remediate these known systemic failures demonstrates a corporate policy of deliberate indifference that was the moving force behind the individual violations and the severe harm suffered by the Plaintiff in this instance.

171. VITALCORE is indifferent to the danger that its practices will result in substandard or even catastrophic medical care.

172. Turning a blind eye to the inadequate and catastrophic instances of care that often result from its policies and practices allows VITALCORE to continue providing inadequate care to the detriment of people who find themselves in prison, like Plaintiff.

173. VITALCORE is a repeat offender and has been sued for similar civil rights violations hundreds of times within the last five years.

174. Further, despite the repeated acts of deliberate indifference by the individuals Defendants and other employees of Defendant VITALCORE similarly situated, Defendant VITALCORE did nothing to retrain, remedy or otherwise address the pervasive unconstitutional conduct of its employees and agents, thereby condoning the unconstitutional conduct.

175. As a result of VITALCORE'S official policy and custom of delaying costly medical treatment and specialty care, Plaintiff did not receive the Ocrevus treatment he needed after his MS diagnosis, resulting in his disease progressively worsening, new lesions forming, and permanent and severe physical disabilities.

## CAUSES OF ACTION

## COUNT I

### DELIBERATE INDIFFERENCE TO MEDICAL NEEDS AGAINST PROVATAS

176. Plaintiff reincorporates and restates each and every allegation contained in the preceding paragraphs as if fully set forth herein.

177. At all times mentioned herein Defendant PROVATAS was acting under color of law, and/or her statutory or legal authority.

178. Pursuant to 42 U.S.C. § 1983, as well as the Eighth and Fourteenth Amendments to the United States Constitution, Defendant PROVATAS owed Plaintiff the duty to act prudently and with reasonable care, and otherwise to avoid cruel and unusual punishment.

179. Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, the Civil Rights Act, specifically 42 U.S.C. § 1983, a detainee like Plaintiff

had the right to timely medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

180. The foregoing rights were clearly established at the time of the violations.

181. The conduct of Defendant PROVATAS deprived Plaintiff of his clearly established rights, privileges, and immunities in violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

182. At all relevant times hereto, Defendant PROVATAS was aware that Plaintiff suffered from Multiple Sclerosis and needed urgent treatment to prevent the progression of his disease and further physical deterioration. Despite this, Defendant PROVATAS knew of and consciously disregarded the substantial risk that Plaintiff's condition if allowed to progress untreated would lead to lifelong severe and permanent disabilities.

183. Defendant PROVATAS violated Plaintiff's civil rights when she displayed deliberate indifference toward Plaintiff's serious medical condition in the following ways:

a. Failing to provide Plaintiff with timely and/or immediate medical attention for a serious medical need;

b. Failing to ensure that Plaintiff received appropriate and timely treatment of his MS;

c. Allowing Plaintiff to continue to deteriorate despite knowing of his serious medical diagnosis and need for MS treatment;

d. Failing to timely respond to calls and concerns for Plaintiff's wellbeing and need for treatment of his MS;

e. Failing to timely arrange and coordinate treatment for his MS;

f. Any and all other breaches that become known during the course of discovery which are hereby incorporated by reference.

184. The acts and/or omissions of Defendant PROVATAS violated the civil rights of Plaintiff which directly and proximately caused Plaintiff to suffer numerous injuries including, but not limited to the following progressive worsening of his Multiple Sclerosis, new demyelinating lesions, profound neurological deterioration, permanent physical disability, pain and suffering, loss of mobility, bowel and bladder dysfunction, and other permanent injuries.

185. The acts and/or omissions of Defendant PROVATAS were willful, wanton, reckless, malicious, oppressive and/or done with a conscious or reckless disregard and deliberate indifference for the rights of Plaintiff and Plaintiff therefore requests an award of punitive and exemplary damages against PROVATAS according to proof.

186. These deprivations were caused by the customs, policies, and established practices of Defendants ACH and NEWAYGO COUNTY acting under color of its statutory and legal authority.

187. Punitive damages are available against Defendant PROVATAS and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983).

188. Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT II

### 42 U.S.C. § 1983 – Corporate Liability (Monell)

### *(Against Defendant Advanced Correctional Healthcare, Inc.)*

189. Plaintiff reincorporates and restates each and every allegation contained in the preceding paragraphs as if fully set forth herein.

190. At all times relevant hereto, Defendant ACH was a private corporation performing a traditional, exclusive public function—providing comprehensive medical care to inmates and detainees at the Newaygo County Jail—and was therefore acting under color of law for purposes of 42 U.S.C. § 1983.

191. Defendant PROVATAS committed the constitutional violations herein described as a result of the training and/or lack of training and/or lack of retraining by Defendant ACH.

192. Defendant ACH failed to properly train, monitor, direct, discipline and supervise its medical staff, including PROVATAS, and knew or should have known that PROVATAS would engage in the complained-of behavior given the pervasive unconstitutional conduct of these Defendants.

193. In all of the aforementioned policies, practices and customs of Defendant ACH and its failure to properly and adequately train, monitor, instruct, direct, discipline, and supervise PROVATAS, Defendant ACH was reckless and deliberately indifferent to a likelihood that the constitutional rights of the public and particularly of Plaintiff would be violated.

194. This improper training, monitoring, instruction, direction, discipline and supervision proximately caused the deprivation of Plaintiff's right to receive adequate medical attention and treatment for Plaintiff's serious medical needs.

195. As a direct and proximate result of the unconstitutional actions and omissions of Defendant ACH, Plaintiff sustained the serious injuries previously described.

196. Defendant ACH's policies, procedures and/or customs were also deliberately indifferent to Plaintiff's serious medical needs in that said policies and

customs did not ensure that his serious medical condition was timely and adequately treated, such that same amounted to deliberate indifference to Plaintiff's serious medical needs.

197. During the weeks preceding Plaintiff's transfer from the Newaygo County Jail, Dr. Lannen's office repeatedly contacted the Newaygo County Jail and PROVATAS for the express purpose of arranging initiation of Plaintiff's prescribed treatment. On each occasion, PROVATAS were reminded that Plaintiff had been diagnosed with Multiple Sclerosis, that treatment had been recommended, and that coordination of care was necessary. Nevertheless, PROVATAS failed to implement the treating neurologist's recommendations or otherwise ensure that Plaintiff received timely treatment.

198. The repeated failure of PROVATAS to act upon Plaintiff's known medical needs, despite repeated communications from Plaintiff, Plaintiff's treating neurologist, Plaintiff's attorney, hospital records, emergency department records, and Plaintiff's obvious physical deterioration, demonstrates that the constitutional violations suffered by Plaintiff were not isolated acts of negligence or inadvertent oversight by individual employees.

199. Rather, these repeated failures reflected longstanding institutional customs, practices, policies, training deficiencies, supervisory failures, and operational decisions maintained and enforced by ACH regarding the evaluation, coordination, approval, implementation, and delivery of specialty medical care to inmates suffering from serious medical conditions.

200. That Defendant ACH's, policies, procedures and/or customs implemented to deliver and coordinate said medical services to detainees/inmates, including Plaintiff's,

were deliberately indifferent to Plaintiff's serious medical needs in that it had a policy, custom and/or practice of delaying vital but expensive medical treatment long enough that the inmate was transferred into MDOC and so as not to incur that expense and thus resulting in additional profits to ACH.

201. That Plaintiff's constitutional rights were violated and Defendant ACH's policy and/or custom of failing to train and/or supervise its employees, including PROVATAS, was a moving force behind the deprivation of Plaintiff's Eighth and Fourteenth Amendment Rights.

202. Further, that the motivating and moving force for PROVATAS' conduct as described herein, such that same also amounted to the deprivation of Plaintiff's Eight and Fourteenth Amendment Rights, were the result of the following unconstitutional official policies, procedures, customs and/or practices of Defendant ACH:

a. A policy, custom or practice of failing to establish and enforce adequate continuity-of-care procedures to ensure that treatment recommendations made by outside specialists were timely implemented;

b. A policy, custom or practice of failing to train employees in the recognition of medical conditions that required immediate treatment;

c. A policy, custom or practice of failing to discipline or reprimand employees who do not follow company policies and/or standards that put inmates' health at risk;

d. A policy, custom or practice of denying inmates at the Newaygo County Jail access to timely and appropriate medications for their serious medical needs;

e. A policy, custom or practice of denying and/or delaying the execution of outside physician treatment recommendations and specialty referrals until inmates were transferred from Newaygo County Jail;

f. A policy, custom or practice of delaying any response to outside specialists to coordinate medically necessary treatment;

g. A policy, custom or practice of delaying specialty care and treatment as a cost-savings strategy and to increase ACH profits at the detriment of inmates, including Plaintiff's health and overall condition;

h. Any other polices, customs or practices that become known through the course of discovery.

203. Defendant ACH maintains a non-delegable operational, administrative, and clinical policy, custom, and practice to control, limit, and reduce corporate expenditures by delaying, denying, or entirely avoiding necessary specialized medical treatments, diagnostic testing, off-site specialist evaluations, and costly medications (such as Ocrevus).

204. This cost-containment policy and custom is designed to maximize corporate profit margins at the direct expense of the serious, objective medical needs of the inmates and detainees entrusted to ACH's care.

205. Pursuant to these official policies, unwritten customs, and systemic operational practices, Defendant ACH routinely:

a. Imposes financial disincentives or bureaucratic hurdles (such as mandatory, protracted internal review chains or "watch and wait" directives) designed to delay the authorization of high-cost specialty care and specialty prescriptions.

b. Maintains a corporate practice of "passing the buck" by intentionally deferring high-cost treatments until an inmate is transferred out of an ACH-contracted facility, thereby shifting the financial burden of care to other entities (such as the MDOC) regardless of the medical risks of delay.

c. Fails to adequately train, supervise, and discipline its medical staff, including Defendant PROVATAS, regarding the constitutional requirement to provide continuity of care for chronic, progressive illnesses and the prohibition against prioritizing corporate cost savings over specialist orders.

206. Defendant ACH's corporate policy-makers had actual or constructive knowledge that the failure to implement appropriate oversight mechanisms for high-cost, progressive neurological conditions like Multiple Sclerosis would result in a systemic failure to provide constitutionally adequate care, creating an obvious risk of severe, permanent disability to detainees/inmates, including Plaintiff.

207. Defendant ACH knew, or through the exercise of reasonable diligence should have known, that these policies, customs, practices, and operational failures created a substantial and obvious risk that inmates suffering from serious medical conditions would experience delayed diagnosis, delayed treatment, preventable disease progression, unnecessary pain and suffering, permanent disability, and other serious harm.

208. Despite possessing this knowledge, ACH acted with deliberate indifference and consciously failed to implement reasonable corrective measures, failed to modify its policies and practices, failed to adequately supervise and train its medical personnel, and continued to maintain customs and operational practices that it knew would expose inmates with serious medical needs to an unreasonable and substantial risk of serious harm, and instead encouraged a culture of medical inaction to preserve corporate capital.

209. As a direct and proximate result of these unconstitutional policies, customs, and practices, Plaintiff was denied timely treatment for his Multiple Sclerosis for months, during which time his disease progressed unchecked, resulting in extensive new demyelinating lesions, profound neurological deterioration, permanent physical disability, pain and suffering, loss of mobility, bowel and bladder dysfunction, and other permanent injuries.

210. Punitive damages are available against Defendant ACH and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983).

211. Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT III

### 42 U.S.C. § 1983 – CORPORATE LIABILITY (MONELL)

### *(AGAINST DEFENDANT NEWAYGO COUNTY)*

212. Plaintiff reincorporates and restates each and every allegation contained in the preceding paragraphs as if fully set forth herein.

213. Pursuant to 42 U.S.C. § 1983, as well as the Eighth and Fourteenth Amendments to the United States Constitution, Defendant NEWAYGO COUNTY owed Plaintiff certain duties to properly supervise, monitor, and train its offices, administrators, employees and agents and contractors so that they would detect serious medical conditions in detainees/inmates and facilitate prompt and timely medical care and treatment.

214. Multiple Sclerosis is a serious medical condition that requires timely treatment.

215. Defendant NEWAYGO COUNTY, under the color of law, acted with deliberate indifference to Plaintiff's serious medical needs during his confinement at the Newaygo County Jail in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

216. At all relevant times, Defendant NEWAYGO COUNTY contracted with ACH to provide medical services to the inmates and detainees at Newaygo County Jail, including Plaintiff.

217. That pursuant to the contract, Defendant ACH, was supposed to provide pertinent services in the Newaygo County Jail, including, but not limited to: assessments of all inmates; comprehensive health evaluations; medication administration; emergency and specialty medical care, and; treatment coordination.

218. Under the Eighth and Fourteenth Amendments, Defendant NEWAYGO COUNTY owes a non-delegable constitutional duty to provide adequate and timely medical care to detainees in its custody. While the County may contract with a private entity like ACH to deliver hands-on clinical services, it cannot contract away its ultimate constitutional liability or shield itself from *Monell* liability by abdicating all oversight to a third-party corporation.

219. Through its agents and employees, Defendant NEWAYGO COUNTY's treatment of Plaintiff, including contracting with Defendant ACH and knowing it did not have policies and procedures of hiring and investigating their doctors and staff, adequate oversight, supervision, training, procedures, policies, or mechanisms to ensure the safety and health of inmates/detainees constitutes an official policy, custom, pattern, or practice that deprived Plaintiff of his civil rights as guaranteed by the United States Constitution.

220. The deprivation of constitutional rights alleged in this complaint are the direct result of official policy, customs, and practices of Defendant NEWAYGO COUNTY, as well as contractor Defendant ACH.

221. That Defendant NEWAYGO COUNTY encouraged, condoned, and/or tolerated ACH's official customs, policies, practices, and/or procedures including such for failure to properly staff, screen, train, and/or supervise the conduct described herein, such that same amounted to deliberate indifference to Plaintiff's serious medical needs.

222. That Defendant NEWAYGO COUNTY's and ACH's policies and procedures implemented to deliver and coordinate medical services to inmates/detainees, including Plaintiff, were deliberately indifferent to Plaintiff's serious medical needs in that said policies did not ensure that his serious medical condition was timely and adequately treated.

223. That Defendant NEWAYGO COUNTY's and ACH's policies and procedures implemented to deliver and coordinate said medical services to inmates, including Plaintiff, were deliberately indifferent to Plaintiff's serious medical needs in that they had a policy, custom and/or practice of delaying costly medical treatment until inmates were transferred into the MDOC system.

224. That Plaintiff's constitutional rights were violated and Defendant NEWAYGO COUNTY's and ACH's unconstitutional official, procedures, practices and/or customs were the moving force behind the deprivation of Plaintiff's Eighth and Fourteenth Amendment Rights by Defendant PROVATAS.

225. At all times relevant, Defendant NEWAYGO COUNTY, by and through its policymakers for jail operations, maintained an unwritten, widespread, and deeply entrenched custom, policy, and practice of deliberate indifference to the serious medical needs of inmates and detainees, which includes:

a. A policy and/or custom of total abdication and blind outsources, systematically delegating final medical decision-making authority to a for-profit contractor (ACH) while intentionally failing to maintain any mechanism for administrative oversight, quality control, or medical escalation when contracted staff ignored life altering specialist orders;

b. A policy and/or custom where jail administrative staff and supervisors deliberately ignore explicit, external alerts regarding inmate medical neglect and completely refuse to intervene or override contracted medical staff during an obvious, visible medical crisis.

c. Failing to implement a continuity of care protocol, namely maintaining an operational practice that fails to cross-reference or act upon repeated, urgent contact from outside medical specialists (such as Dr. Lannen's neurology clinic) who are actively attempting to initiate critical, time-sensitive treatments for serious conditions like Multiple Sclerosis.

d. A policy, custom or practice of failing to establish and enforce adequate continuity-of-care procedures to ensure that treatment recommendations made by outside specialists were timely implemented;

e. A policy, custom or practice of failing to train employees in the recognition of medical conditions that required immediate treatment;

f. A policy, custom or practice of failing to discipline or reprimand employees who do not follow company policies and/or standards that put inmates' health at risk;

g. A policy, custom or practice of denying inmates at the Newaygo County Jail access to timely and appropriate medications for their serious medical needs;

h. A policy, custom or practice of denying and/or delaying the execution of outside physician treatment recommendations and specialty referrals until inmates were transferred from Newaygo County Jail;

i. A policy, custom or practice of delaying any response to outside specialists to coordinate medically necessary treatment;

j. Any other polices, customs or practices that become known through the course of discovery.

226. Defendant NEWAYGO COUNTY had actual or constructive notice of these systemic deficiencies. Specifically, Newaygo County Jail staff directly observed Plaintiff rapidly losing his mobility and deteriorating physically over several months. Furthermore, jail administration received express written notice from Plaintiff's legal counsel that his medical needs were being ignored, yet the County deliberately chose to take no corrective action.

227. The failure of NEWAYGO COUNTY to train its staff, implement oversight over ACH, or intervene in Plaintiff's care reflects a deliberate, conscious choice by municipal policymakers, amounting to deliberate indifference to the constitutional rights of detainees.

228. Defendant NEWAYGO COUNTY knew, or through the exercise of reasonable diligence should have known, that these policies, customs, practices, and operational failures created a substantial and obvious risk that inmates suffering from serious medical conditions would experience delayed diagnosis, delayed treatment, preventable disease progression, unnecessary pain and suffering, permanent disability, and other serious harm.

229. Despite possessing this knowledge, NEWAYGO COUNTY consciously failed to implement reasonable corrective measures, failed to modify its policies and practices, knew of and disregarded ACH's pattern of providing constitutionally inadequate care, and continued to maintain customs and operational practices that it knew would expose inmates with serious medical needs to an unreasonable and substantial risk of serious harm.

230. The foregoing policies, customs, practices, failures to train, failures to supervise, failures to ensure continuity of specialty care, and failures to implement outside specialist treatment recommendations constituted official policies and longstanding customs of Newaygo County Jail and were the moving force behind the violation of Plaintiff's constitutional rights.

231. As a direct and proximate result of these unconstitutional policies, customs, and practices, Plaintiff was denied timely treatment for his Multiple Sclerosis for months, during which time his disease progressed unchecked, resulting in extensive new demyelinating lesions, profound neurological deterioration, permanent physical disability, pain and suffering, loss of mobility, bowel and bladder dysfunction, and other permanent injuries.

232. Punitive damages are available against Defendant NEWAYGO COUNTY and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983).

233. Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT IV

### DELIBERATE INDIFFERENCE TO MEDICAL NEEDS AGAINST DEFENDANTS FRY, SCHULTZ, SAWYER, VANHALL, SHELTON, WOLINSKI, JOHN DOE 1, AND JOHN DOE 2

234. Plaintiff reincorporates and restates each and every allegation contained in the preceding paragraphs as if fully set forth herein.

235. At all times mentioned herein Defendants FRY, SCHULTZ, SAWYER, VANHALL, SHELTON, WOLINSKI, JOHN DOE 1 and JOHN DOE 2, were acting under color of law, and/or their statutory or legal authority.

236. At all times relevant hereto, Defendants FRY, SCHULTZ, SAWYER, VANHALL, SHELTON, WOLINSKI, JOHN DOE 1 and JOHN DOE 2 subjected Plaintiff to a deprivation of his rights, privileges, and immunities, as secured by the Constitution and laws of the United States.

237. Pursuant to 42 U.S.C. § 1983, as well as the Eighth Amendment to the United States Constitution, Defendants FRY, SCHULTZ, SAWYER, VANHALL, SHELTON, WOLINSKI, JOHN DOE 1 and JOHN DOE 2 owed Plaintiff the duty to act prudently and with reasonable care, and otherwise to avoid cruel and unusual punishment.

238. Pursuant to the Eighth Amendment of the United States Constitution, the Civil Rights Act, specifically 42 U.S.C. § 1983, a inmate like Plaintiff had the right to timely medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

239. The foregoing rights were clearly established at the time of the violations.

240. The conduct of Defendants FRY, SCHULTZ, SAWYER, VANHALL, SHELTON, WOLINSKI, JOHN DOE 1 and JOHN DOE 2 deprived Plaintiff of his clearly established rights, privileges, and immunities in violation of the Eighth Amendment of the United States Constitution and 42 U.S.C. § 1983.

241. At all relevant times hereto, Defendants FRY, SCHULTZ, SAWYER, VANHALL, SHELTON, WOLINSKI, JOHN DOE 1 and JOHN DOE 2 were aware that Plaintiff suffered from Multiple Sclerosis and needed urgent treatment to prevent the progression of his disease and further physical deterioration. Despite this, Defendants FRY, SCHULTZ, SAWYER, VANHALL, SHELTON, WOLINSKI, JOHN DOE 1 and JOHN DOE 2 knew of and consciously disregarded the substantial risk that Plaintiff's condition if allowed to progress untreated would lead to lifelong severe and permanent disabilities.

242. Defendants FRY, SCHULTZ, SAWYER, VANHALL, SHELTON, WOLINSKI, JOHN DOE 1 and JOHN DOE 2 violated Plaintiff's civil rights when they displayed deliberate indifference toward Plaintiff's serious medical condition in the following ways:

a. Failing to provide Plaintiff with timely and/or immediate medical attention for a serious medical need;

b. Failing to ensure that that Plaintiff received timely treatment of his MS;

c. Allowing Plaintiff to continue to deteriorate despite knowing of his serious medical diagnosis and need for treatment;

d. Failing to timely respond to calls and concerns for Plaintiff's wellbeing and need for treatment of his MS;

e. Failing to timely arrange and coordinate treatment for his MS;

f. Any and all other breaches that become known during the course of discovery which are hereby incorporated by reference.

243. The acts and/or omissions of Defendants FRY, SCHULTZ, SAWYER, VANHALL, SHELTON, WOLINSKI, JOHN DOE 1 and JOHN DOE 2 violated the civil rights of Plaintiff which directly and proximately caused Plaintiff to suffer numerous injuries including, but not limited to the following progressive worsening of his Multiple Sclerosis, new demyelinating lesions, profound neurological deterioration, permanent physical disability, pain and suffering, loss of mobility, bowel and bladder dysfunction, and other permanent injuries.

244. The acts and/or omissions of Defendants FRY, SCHULTZ, SAWYER, VANHALL, SHELTON, WOLINSKI, JOHN DOE 1 and JOHN DOE 2 were willful, wanton, reckless, malicious, oppressive and/or done with a conscious or reckless disregard and deliberate indifference for the rights of Plaintiff and Plaintiff therefore requests an award of punitive and exemplary damages against these Defendants according to proof.

245. Punitive damages are available against Defendants FRY, SCHULTZ, SAWYER, VANHALL, SHELTON, WOLINSKI, JOHN DOE 1 and JOHN DOE 2 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983).

246. Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT V

### DELIBERATE INDIFFERENCE TO MEDICAL NEEDS AGAINST EDGAR, MELINOWSKI, WRIGHT AND BARDEN

247. Plaintiff reincorporates and restates each and every allegation contained in the preceding paragraphs as if fully set forth herein.

248. At all times mentioned herein Defendants EDGAR, MELINOWSKI, WRIGHT and BARDEN were acting under color of law, and/or their statutory or legal authority.

249. At all times relevant hereto, Defendants EDGAR, MELINOWSKI, WRIGHT and BARDEN subjected Plaintiff to a deprivation of his rights, privileges, and immunities, as secured by the Constitution and laws of the United States.

250. Pursuant to 42 U.S.C. § 1983, as well as the Eighth Amendment to the United States Constitution, Defendants EDGAR, MELINOWSKI, WRIGHT and BARDEN owed Plaintiff the duty to act prudently and with reasonable care, and otherwise to avoid cruel and unusual punishment.

251. Pursuant to the Eighth Amendment of the United States Constitution, the Civil Rights Act, specifically 42 U.S.C. § 1983, an inmate like Plaintiff had the right to

timely medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

252. The foregoing rights were clearly established at the time of the violations.

253. The conduct of Defendants EDGAR, MELINOWSKI, WRIGHT and BARDEN deprived Plaintiff of his clearly established rights, privileges, and immunities in violation of the Eighth Amendment of the United States Constitution and 42 U.S.C. § 1983.

254. At all relevant times hereto, Defendants EDGAR, MELINOWSKI, WRIGHT and BARDEN were aware that Plaintiff suffered from Multiple Sclerosis and needed urgent treatment to prevent the progression of his disease and further physical deterioration. Despite this, Defendants EDGAR, MELINOWSKI, WRIGHT and BARDEN knew of and consciously disregarded the substantial risk that Plaintiff's condition if allowed to progress untreated would lead to lifelong severe and permanent disabilities.

255. Defendants EDGAR, MELINOWSKI, WRIGHT and BARDEN violated Plaintiff's civil rights when they displayed deliberate indifference toward Plaintiff's serious medical condition in the following ways:

a. Failing to provide Plaintiff with timely and/or immediate medical attention for a serious medical need;

b. Failing to ensure that that Plaintiff received timely treatment of his MS;

c. Allowing Plaintiff to continue to deteriorate despite knowing of his serious medical diagnosis and need for treatment;

d. Failing to timely respond to calls and concerns for Plaintiff's wellbeing and need for treatment of his MS;

e. Failing to timely arrange and coordinate treatment for his MS;

f. Any and all other breaches that become known during the course of discovery which are hereby incorporated by reference.

256. The acts and/or omissions of Defendants EDGAR, MELINOWSKI, WRIGHT and BARDEN violated the civil rights of Plaintiff which directly and proximately caused Plaintiff to suffer numerous injuries including, but not limited to the following progressive worsening of his Multiple Sclerosis, new demyelinating lesions, profound neurological deterioration, permanent physical disability, pain and suffering, loss of mobility, bowel and bladder dysfunction, and other permanent injuries.

257. The acts and/or omissions of Defendants EDGAR, MELINOWSKI, WRIGHT and BARDEN were willful, wanton, reckless, malicious, oppressive and/or done with a conscious or reckless disregard and deliberate indifference for the rights of Plaintiff and Plaintiff therefore requests an award of punitive and exemplary damages against these Defendants according to proof.

258. Punitive damages are available against Defendants EDGAR, MELINOWSKI, WRIGHT and BARDEN and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983).

259. Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT VI

### 42 U.S.C. § 1983 – CORPORATE LIABILITY (MONELL)

### *(AGAINST DEFENDANT VITALCORE HEALTH STRATEGIES, LLC)*

260. Plaintiff reincorporates and restates each and every allegation contained in the preceding paragraphs as if fully set forth herein.

261. At all times relevant, Defendant VITALCORE was a private corporation performing a traditional, exclusive public function—providing comprehensive medical care to inmates at in the Michigan Department of Corrections, including at Carson City Correctional Facility and was therefore acting under color of state law for purposes of 42 U.S.C. § 1983.

262. Defendants EDGAR, WRIGHT, MELINOWSKI and BARDEN committed the constitutional violations herein described as a result of the training and/or lack of training and/or lack of retraining by Defendant VITALCORE.

263. Defendant VITALCORE failed to properly train, monitor, direct, discipline and supervise its medical staff, including EDGAR, WRIGHT, MELINOWSKI and BARDEN, and knew or should have known that the medical staff would engage in the complained-of behavior given the pervasive unconstitutional conduct of these Defendants and other agents of Defendant VITALCORE.

264. All of the aforementioned policies, practices and customs of Defendant VITALCORE and its failure to properly and adequately train, monitor, instruct, direct, discipline, and supervise Defendants EDGAR, WRIGHT, MELINOWSKI, and BARDEN, were reckless and deliberately indifferent to a likelihood that the constitutional rights of the public and particularly of Plaintiff would be violated.

265. This improper training, monitoring, instruction, direction, discipline and supervision proximately caused the deprivation of Plaintiff's right to receive adequate medical attention and treatment for Plaintiff's serious medical needs.

266. As a direct and proximate result of the unconstitutional actions and omissions of Defendant VITALCORE, Plaintiff sustained the serious injuries previously described.

267. That Defendant VITALCORE adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including such for failure to properly staff, screen, train, and/or supervise the conduct described herein, such that same amounted to deliberate indifference to Plaintiff's serious medical needs.

268. That Defendant VITALCORE's policies, procedures and/or customs were deliberately indifferent to Plaintiff's serious medical needs in that said policies and customs did not ensure that his serious medical condition was timely and adequately treated.

269. During Plaintiff's imprisonment in the MDOC and Carson City Correctional Facility, Plaintiff repeatedly informed the healthcare providers that he had been diagnosed with MS, that he was supposed to start receiving treatment months earlier, and that his health was progressively deteriorating in severe and grievous ways that would not be permanent as new lesions formed. On each occasion, Plaintiff was advised to be "patient" and that his treatment would not be given until he was able to see their neurology specialist's months later, despite already undergoing all testing, receiving the MS diagnosis, and a treatment plan already being put in place by neurologist Dr. Lannen.

270. The repeated failure of VITALCORE employees, including EDGAR, WRIGHT, MELINOWSKI and BARDEN, to act upon Plaintiff's known medical needs, despite repeated communications from Plaintiff and Plaintiff's obvious physical

deterioration, demonstrates that the constitutional violations suffered by Plaintiff were not isolated acts of negligence or inadvertent oversight by individual employees.

271. Rather, these repeated failures reflected longstanding institutional customs, practices, policies, training deficiencies, supervisory failures, and operational decisions maintained and enforced by VITALCORE regarding the evaluation, coordination, approval, implementation, and delivery of specialty medical care to inmates suffering from serious medical conditions.

272. That Defendant VITALCORE's, policies, procedures and/or customs implemented to deliver and coordinate said medical services to inmates, including Plaintiff's, were deliberately indifferent to Plaintiff's serious medical needs in that it had a policy, custom and/or practice of delaying vital but expensive medical treatment so as not to incur expenses for costly medical treatment and medical specialists thus resulting in additional profits to VITALCORE.

273. That Plaintiff's constitutional rights were violated and Defendant VITALCORE's policy and/or custom of failing to train and/or supervise its employees, including Defendants EDGAR, WRIGHT, MELINOWSKI, and BARDEN, was a moving force behind the deprivation of Plaintiff's Eighth Amendment Rights.

274. Further, that the motivating and moving force for the individual Defendants' conduct as described herein, such that same also amounted to the deprivation of Plaintiff's Eighth Amendment Rights, were the result of the following unconstitutional official policies, procedures, customs and/or practices of Defendant VITALCORE:

a. A policy, custom or practice of failing to establish and enforce adequate continuity-of-care procedures to ensure that treatment recommendations made by outside specialists were timely implemented;

b. A policy, custom or practice of failing to train employees in the recognition of medical conditions that required immediate treatment;

c. A policy, custom or practice of failing to discipline or reprimand employees who do not follow company policies and/or standards that put inmates' health at risk;

d. A policy, custom or practice of denying inmates in the MDOC access to timely and appropriate medications for their serious medical needs;

e. A policy, custom or practice of denying inmates in the MDOC access to timely and appropriate specialists for their serious medical needs;

f. A policy, custom or practice of requiring inmates to see VITALCORE's specialists of choice before implementing treatment, despite the fact that the inmate had already been diagnosed and treatment recommended by a qualified specialist, thus resulting in delay of necessary medical care and treatment;

g. A policy, custom or practice of delaying specialty care and treatment as a cost-savings strategy and to increase VITALCORE's profits at the detriment of inmates, including Plaintiff's health and overall condition;

h. Any other polices, customs or practices that become known through the course of discovery.

275. Defendant VITALCORE maintains an official policy, widespread custom, and systemic operational practice aimed at restricting the availability of high-cost specialized pharmaceuticals and off-site specialist interventions through aggressive cost-containment protocols.

276. This profit-driven policy and custom dictates that high-cost specialty medications (such as Ocrevus) and specialized clinical oversight are systematically delayed, stalled, or substituted with inadequate, lower-cost alternatives (such as routine, distant scheduling or minor symptom-management) to minimize operational overhead.

277. Pursuant to these unconstitutional policies, customs, and practices, Defendant VITALCORE routinely:

a. Utilizes systematic scheduling delays (such as approving "routine" instead of "urgent" consultations and allowing appointments to be pushed back for months) as an active cost-mitigation strategy to defer the financial obligations associated with expensive specialist treatments.

b. Maintains an unwritten custom of deliberate blindness toward clear, escalating clinical evidence of physical deterioration, requiring field staff to cross-examine or await duplicative diagnostic testing rather than executing existing, definitive outside specialist scripts and plans of care.

c. Fails to train, supervise, or instruct its medical providers (including Defendants EDGAR, WRIGHT, MELINOWSKI, and BARDEN) to recognize emergency escalations in progressive autoimmune disorders, or to fast-track patients when a prior delay has already resulted in profound physical decline.

278. Defendant VITALCORE's corporate policy-makers were well aware, through prior litigation, internal grievances, and industry clinical standards, that a policy of withholding or delaying critical disease-modifying therapies for progressive neurological disorders would inevitably cause severe, irreversible physiological harm to inmates.

279. Defendant VITALCORE deliberately chose to maintain these cost-saving practices, demonstrating a corporate ethos of deliberate indifference to the serious medical needs of prisoners, including Plaintiff.

280. Defendant VITALCORE knew, or through the exercise of reasonable diligence should have known, that these policies, customs, practices, and operational failures created a substantial and obvious risk that inmates suffering from serious medical conditions would experience delayed treatment, preventable disease progression, unnecessary pain and suffering, permanent disability, and other serious harm.

281. Despite possessing this knowledge, VITALCORE consciously failed to implement reasonable corrective measures, failed to modify its policies and practices, failed to adequately supervise and train its medical personnel, and continued to maintain customs and operational practices that it knew would expose inmates with serious medical needs to an unreasonable and substantial risk of serious harm.

282. The foregoing policies, customs, practices, failures to train, failures to supervise, failures to ensure continuity of specialty care, and failures to implement outside specialist treatment recommendations constituted official policies and longstanding customs of VITALCORE and were the moving force behind the violation of Plaintiff's constitutional rights.

283. As a direct and proximate result of these unconstitutional policies, customs, and practices, Plaintiff was denied timely treatment for his Multiple Sclerosis for months, during which time his disease progressed unchecked, resulting in extensive new demyelinating lesions, profound neurological deterioration, permanent physical disability, pain and suffering, loss of mobility, bowel and bladder dysfunction, and other permanent injuries.

284. Punitive damages are available against Defendant ACH and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983).

285. Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## DAMAGES

286. Plaintiff reincorporates and restates each and every allegation contained in the preceding paragraphs as if fully set forth herein.

287. As a direct and proximate result of the actions and violations of Defendants set forth herein above, Plaintiff sustained serious injuries and is entitled to compensatory damages, punitive damages and attorney fees pursuant to 42 U.S.C. §§ 1983 and 1988.

288. As a direct and proximate result of the actions and violations of Defendants set forth herein above, Plaintiff suffered the following injuries and damages:

a. Special damages in the form of medical expenses;
b. Compensatory damages;
c. Pain, suffering and deformity;
d. Lost wages;
e. Lost earnings capacity;
f. Out of pocket expenses;
g. Loss of consortium;
h. Punitive damages
i. Reasonable costs and attorneys' fees under 42 U.S.C. § 1988.

## RELIEF REQUESTED

WHEREFORE, Plaintiff, SHANE VELTKAMP, prays that this Honorable Court grant the following relief against Defendants, jointly and severally:

a. Compensatory damages in an amount which is fair, just and reasonable;
b. Punitive damages in an amount which is fair, just and reasonable; and

c. Such other and further relief as this Honorable Court may deem appropriate, including costs, interest and reasonable attorney fees pursuant to 42 U.S.C. § 1988.

## JURY DEMAND

Plaintiff in the above-entitled matter demands a trial by jury of all issues so triable in the matter and respectfully request that the matter be placed om the jury docket.

Respectfully submitted,

By: *__/s/ Lisa M. Esser____________*

MATTHEW L. TURNER (P48706)
LISA M. ESSER (P70628)
SOMMERS SCHWARTZ, P.C.
One Towne Square, Ste. 1700
Southfield, MI 48076
(248) 355-0300
Attorneys for Plaintiff
Lesser@sommerspc.com
Mturner@sommerspc.com

Dated: July 27, 2026